UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**ROBYN T. WINDSOR** and
**FRANCIS S. WINDSOR,**

    Plaintiffs,

    v.                                     Case No. 22-CV-734-SCD

**STATE FARM FIRE AND CASUALTY COMPANY,**

    Defendant.

## DECISION AND ORDER GRANTING THE PLAINTIFFS' MOTION FOR DECLARATORY JUDGMENT

This diversity action arises from a dispute between State Farm Fire and Casualty Company and its policyholders, Robyn and Francis Windsor, concerning damage the Windsors' home incurred due to blasting at a neighboring property. Although State Farm acknowledges that the blasting caused a crack in a basement wall, the insurer disputes that any other damage resulted from the blast. The parties also significantly disagree on how to remedy the cracked wall. State Farm believes the wall can be repaired or replaced; the Windsors insist that the entire home must be razed and rebuilt.

In an attempt to resolve their dispute, the Windsors demanded appraisal under a provision in their insurance policy that permits either party to demand an appraisal on the "amount of loss." State Farm rejected the demand because, in the insurer's view, the differences pertained to coverage issues not fit for the appraisal process. The Windsors responded by filing this lawsuit seeking (among other things) declaratory judgment compelling appraisal. Because both the policy's plain language and case law demonstrate that

the parties' dispute is appraisable, and because the Windsors properly demanded appraisal under that policy, the court will grant their motion.

## BACKGROUND[1]

On June 28, 2021, the Windsors purchased a home in Ripon, Wisconsin. The home is made of stone and sits on a bluff overlooking Green Lake. Three days after closing, contractors working on a property directly west of the Windsors' new home used explosives to remove underground rock for a home renovation project. Immediately following the blast, the Windsors noticed damage to their new home, including an interior basement wall, plumbing attached to the wall, a concrete slab near the wall, wood ceiling panels in the kitchen and foyer, tile in the foyer and one of the bathrooms, exterior stone masonry planters, gutter and fascia boards, and the west chimney. The Windsors reported the loss to State Farm on July 6, 2021.

Following the Windsors' reported loss, State Farm hired Envista Forensics to inspect the home for damage and provide repair recommendations for damage resulting from blasting activities. Envista prepared a report in August 2021 concluding that blasting damaged the basement wall but did not cause any of the other damage the Windsors reported. *See* Malloy Aff. Ex. 3, ECF No. 20-3. The damaged wall is a split-level concrete masonry unit; the lower wall extends from the floor up about six-and-a-half feet where it shelves into an eight-inch concrete slab:

---

[1] I take this background information from the complaint, ECF No. 1; the Windsors' memorandum in support of their motion for declaratory judgment, ECF No. 14; and State Farm's brief in opposition to plaintiffs' motion for declaratory judgment, ECF No. 17.



*Id.* at 4. The report notes that vibrations from the blasting created a horizontal crack in the lower wall:



*Id.* at 4, 11. The report further notes that, in addition to the crack, the blast caused the wall to lean and bow toward the den wall. Based on observations made during its inspection, as well

3

as a photo from the pre-blast home inspection, Envista concluded that the damaged wall was not a load-bearing wall. *Id.* at 4–5. It recommended that the wall be removed and replaced.

Meanwhile, the Windsors had their home inspected by several engineers and contractors, including Enea Consulting. *See* Schmidt Decl. Ex. 4, ECF No. 15-4. Enea prepared a report in October 2021 concluding that returning the Windsors' home to its pre-blast condition is not practical nor possible given the unique nature of the home, the way the home was constructed, and building code requirements. *See* Malloy Aff. Ex. 7, ECF No. 20-7. Specifically, Enea concluded that removing the wall would be dangerous given the unknown soil conditions behind the wall, which were closer to the blasting activity, and which supported a large portion of the home's sunroom. In Enea's opinion, the home must be razed and rebuilt, at an estimated cost of $1.5 to $2 million. Based on the findings from those inspections, including the Enea report, the Windsors asked State Farm to tender the limits of their dwelling and debris removal coverages under the Windsors' homeowners policy. Schmidt Decl. Ex. 4, at 1–4.[2]

In response, State Farm sent the Windsors sketches Envista created of two possible solutions to repair their home—an interior repair plan and an exterior repair plan. *See* Schmidt Decl. Ex. 5, ECF No. 15-5. The interior plan involves leaving most of the wall in place, removing the deteriorated mortar, and replacing with new mortar. The exterior plan calls for, in addition to repointing, reinforcing the wall with steel beams. In December 2021, State Farm

---

[2] The policy provided dwelling coverage for "accidental direct physical loss," and State Farm promised to "pay the cost to repair or replace with similar construction and for the same use on the premises . . . the damaged part of the property." Malloy Aff. Ex. 2, ECF No. 20-2 at 9, 16, 22. State Farm also promised to "pay the reasonable expenses [the Windsors] incur[red] in the removal of debris of covered property damaged by a *loss insured*." *Id.* at 12–13.

4

paid the Windsors the actual cash value of the exterior plan, $128,099.04. *See* Schmidt Decl. Ex. 7, ECF No. 15-7.

The Windsors' retained experts, however, do not think that implementing the Envista sketches is feasible. *See* Schmidt Decl. Ex. 8, ECF No. 15-8. RCL Engineering Group pointed out that Envista's proposed solutions focus solely on the damaged basement wall and ignore other issues (e.g., with the roofs, floors, wall, and ceilings) that, in its opinion, also were caused by the blasting. *Id.* at 4–10. RCL also opined that neither plan would put the wall back to its pre-loss condition; it recommended instead that the wall be replaced. Similarly, Enea opined that Envista's proposed solutions are "incomplete, conceptual, and based on speculation of soil conditions and code requirements." *Id.* at 11. It further opined that no contractor would be willing to attempt either proposed solution because the sketches do not provide enough information to develop a repair strategy or estimate repair costs. *Id.* at 11–12. Nevertheless, Enea concluded that, if the repair was possible, it would cost more than $700,000. *Id.* at 12. The Windsors provided the RCL and Enea reports to State Farm and again requested the insurer to tender the limits of the policy's dwelling and debris removal coverages. *Id.* at 1–3. The Windsors also provided State Farm with Enea's detailed replacement cost estimate for the entire home, which totaled over $2.6 million. *See* Schmidt Decl. Ex. 6, ECF No. 15-6.

On May 24, 2022, the Windsors demanded appraisal under the policy, which allows either party to demand an appraisal when the parties disagree on the "amount of loss." *See* Schmidt Decl. Ex. 9, ECF No. 15-9 (quoting Malloy Aff. Ex. 2, at 25). The Windsors attached to the demand letter an updated assessment from RCL indicating that the exterior plan "appears to be generally feasible"—though it does not include several items necessary for the plan's scope—but reiterating its belief that the interior plan is not feasible and would not

5

restore the damaged wall to its pre-loss condition. Schmidt Decl. Ex. 9, at 4–41. They also attached the most recent report from Enea, which continued "to recommend the razing and replacement of the home as the only reliable way to restore all blast related damage to its pre blast condition." *Id.* at 42–43. Enea further indicated that it would cost about $920,000 to implement Envista's exterior plan, and it included a detailed estimate breaking down those costs. *Id.* at 44–55. State Farm rejected the Windsors' appraisal demand on June 2, 2022, explaining that "appraisal does not apply as the differences involved pertained to covered damages and repair methodology. Appraisal is designed to resolve differences in the costs of repairs we agreed are covered." Schmidt Decl. Ex. 10, ECF No. 15-10.

A few weeks after the appraisal rejection, the Windsors sued State Farm in federal court for declaratory judgment, breach of contract, and bad faith. *See* Compl., ECF No. 1. The matter was randomly assigned to this court, and all parties subsequently consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 8. On November 1, 2022, the Windsors filed a motion for declaratory judgment pursuant to section 2201 of United States Code and Rule 57 of the Federal Rules of Civil Procedure. *See* Pls.' Mot. Declaratory J., ECF No. 13. That motion is fully briefed and ready for resolution. *See* Pls.' Mem.; Def.'s Br.; Pls.' Reply Mem., ECF No. 24; Def.'s Sur-Reply, ECF No. 29.

## DISCUSSION

The Declaratory Judgment Act permits district courts, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he phrase 'case of actual controversy' in the Act refers to the type of

6

'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). "In deciding whether there is an actual controversy, [courts] focus on whether the facts alleged 'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Bell v. Taylor*, 827 F.3d 699, 711 (7th Cir. 2016) (quoting *MedImmune, Inc.*, 549 U.S. at 127).

Here, the parties agree that their dispute is appropriate for disposition under the Declaratory Judgment Act. The Windsors seek an order declaring that State Farm must participate in the appraisal process set forth in the homeowners policy. State Farm, on the other hand, asserts that their dispute is not appropriate for appraisal. Declaratory judgment is appropriate in this case, as there's an actual controversy between the parties concerning a legal issue—the applicability of the appraisal provision in an insurance policy.[3]

The parties' dispute centers on the interpretation of the appraisal provision in the Windsors' homeowners policy. The appraisal provision provides in part as follows:

> If *you* and *we* fail to agree on the amount of loss, either party can demand that the amount of the loss be set by appraisal. . . . At least 10 days before demanding appraisal, the party seeking appraisal must provide the other party with written, itemized documentation of a specific dispute as to the amount of the loss, identifying separately each item being disputed.

Malloy Aff. Ex. 2, at 25. The Windsors contend that the matter should be sent to appraisal because the parties do not agree on the "amount of the loss." According to the Windsors, "amount of loss" includes determining the extent of the loss (i.e., how much damage the blast caused) and the scope and price of the work needed to repair that loss. Conversely, State Farm

---

[3] The court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1).

maintains that the appraisal process is limited to determining the value of an item. Disputes over causation and the method of repair are, in State Farm's view, coverage issues, and the appraisal process cannot be used to resolve coverage disputes. State Farm further argues that, even if the parties' dispute is appraisable, the court should not compel appraisal in this case because the Windsors did not properly invoke the appraisal provision.

The parties agree that the substantive law of Wisconsin governs this diversity action. *See* Pls.'s Mem. at 9–10 (applying Wisconsin law); Def.'s Br. at 13–20 (same). Under Wisconsin law, "[t]he interpretation of language in an insurance policy is governed by 'general principles of contract construction.'" *Weimer v. Country Mut. Ins. Co.*, 575 N.W.2d 466, 472 (Wis. 1998) (quoting *Kuhn v. Allstate Ins. Co.*, 532 N.W.2d 124, 128 (Wis. 1995)). "[T]he construction of an insurance policy presents a question of law." *Johnson Controls, Inc. v. London Market*, 2010 WI 52, ¶ 24, 784 N.W.2d 579, 585 (citing *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 2009 WI 13, ¶ 27, 759 N.W.2d 613, 620). The goal in interpreting insurance contracts is "to give effect to the intent of the parties as expressed in the language of the policy." *Johnson Controls*, 784 N.W.2d at 598–99 (quoting *Folkman v. Quamme*, 2003 WI 116, ¶ 12, 665 N.W.2d 857, 864).

"As a general rule, the language in an insurance contract 'is given its common, ordinary meaning,' that is, 'what the reasonable person in the position of the insured would have understood the words to mean.'" *Folkman*, 665 N.W.2d at 865 (quoting Arnold P. Anderson, *Wisconsin Insurance Law* § 1.1(C) (4th ed. 1998)). "When the policy's language is unambiguous, [courts] enforce the contract as written, without resorting to the rules of construction or principles from case law." *Johnson Controls*, 784 N.W.2d at 586 (citing *Plastics Eng'g Co.*, 759 N.W.2d at 620). "However, if the policy language is susceptible to more than one reasonable

8

interpretation, it is ambiguous." *Id.* "[B]ecause the insurer is in a position to write its insurance contracts with the exact language it chooses[,] . . . ambiguity in that language is construed in favor of [the] insured." *Johnson Controls*, 784 N.W.2d at 586 (quoting *Froedtert Mem'l Lutheran Hosp., Inc. v. Nat'l States Ins. Co.*, 2009 WI 33, ¶ 43, 765 N.W.2d 251, 261).

I.  **The Policy's Plain Language Demonstrates That the Parties' Dispute is Appraisable**

The starting place for any contract interpretation issue is the text of the contract. Because the policy at issue in this case does not define "amount of loss," I must look elsewhere to discern its plain meaning. The Wisconsin Supreme Court has explained that "dictionary definitions are dispositive of the ordinary meanings ascribed to contract terms." *Gorton v. Hostak, Henzl & Bichler, S.C.*, 577 N.W.2d 617, 623 (Wis. 1998) (citing *Ervin v. City of Kenosha*, 464 N.W.2d 654, 662–63 (Wis. 1991)). The court has further explained that, because the "goal is to determine the ordinary, common meaning of a word as understood by a reasonable insured, guidance is more appropriately sought in a non-legal dictionary." *Weimer*, 575 N.W.2d at 473 (citing *Holsum Foods v. Home Ins. Co.*, 469 N.W.2d 918, 921 (Wis. Ct. App. 1991)).

Although the parties have not cited any dictionary that defines the full phrase "amount of loss,"[4] the Windsors have provided several definitions of "loss." For example, the Windsors say that loss can mean "destruction" or "ruin." Pls.' Mem. at 11 (citing *Loss*, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss (last visited June 26, 2023); *Loss*, The American Heritage Dictionary of the English Language,

---

[4] An earlier edition of Black's Law Dictionary defined "amount of loss" as "the diminution, destruction, or defeat of the value of, or of the charge upon, the insured subject to the assured, by the direct consequence of the operation of the risk insured against, according to its value in the policy, or in contribution for loss, so far as its value is covered by the insurance." *CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.*, 110 F. Supp. 2d 259, 264–65 (D. Del. 2000) (quoting Black's Law Dictionary 83 (6th ed. 1990)).

9

https://www.ahdictionary.com/word/search.html?q=loss (last visited June 26, 2023). Applying that definition, a reasonable person in the Windsors' position would understand the appraisal provision to permit either party to demand appraisal when the parties disagree on the amount of the destruction or ruin. And the undisputed facts show that the Windsors and State Farm do not agree on how much damage the blast caused.

Dictionaries also specifically define "loss" in the insurance context. For example, the Windsors point out that loss in the insurance context means "the amount of an insured's financial detriment by . . . damage that the insurer is liable for" or "[t]he amount of a claim on an insurer by an insured." *See id.* at 12. Black's Law Dictionary similarly defines loss in the insurance context as "[t]he amount of financial detriment caused by . . . an insured property's damage, for which the insurer becomes liable." *Bonbeck Parker, LLC v. Travelers Indem. Co. of Am.*, 14 F.4th 1169, 1177–78 (10th Cir. 2021) (quoting *Loss*, Black's Law Dictionary (11th ed. 2019)). The Tenth Circuit relied on the Black's Law Dictionary and similar dictionary definitions to conclude that, "in the insurance context, the ordinary meaning of the phrase 'amount of loss' encompasses causation." *Bonbeck*, 14 F.4th at 1177–78.

State Farm does not dispute the dictionary definitions proffered by the Windsors or attempt to distinguish *Bonbeck*. (The case isn't mentioned anywhere in the insurer's briefs.) Rather, State Farm argues that, when read as a whole, the appraisal provision in the homeowners policy limits an appraisal panel to decide only valuation issues. The insurer's argument rests on subsection (h) of the appraisal provision, which states that "Appraisal is only available to determine the amount of the loss of each item in dispute. The appraisers and the umpire have no authority to decide: (1) any other questions of fact . . . [or] (3) questions of coverage." Malloy Aff. Ex. 2, at 26.

Used there, "amount of loss" seems to be synonymous with "value" or "cost." But that does not answer the question posed in this case—whether, in arriving at that dollar figure, the appraisal panel can consider causation or scope issues. The policy does not preclude the panel from deciding all questions of fact; indeed, the amount of loss *is* a factual issue. Thus, questions of fact necessary for determining the amount of loss are not necessarily off limit— that's why the policy says the panel cannot decide any *other* questions of fact. Similarly, the fact that the policy precludes the panel from deciding questions of coverage does not answer the threshold question of whether the extent of the loss and the scope of the repairs *is* a coverage issue. Subsection (h) of the appraisal provision therefore does not plainly limit the panel from considering causation or scope of repair issues when determining the amount of loss.

In sum, a reasonable person in the position of the Windsors would have understood the phrase "amount of loss" in the homeowners policy to encompass the extent of the loss and the scope of the repairs. Because the policy's language is unambiguous, I must enforce its literal terms without resorting to rules of construction or principles from case law.

## II. Case Law Further Supports Finding the Parties' Dispute Appraisable

Consulting principles from case law leads to the same result. "[T]he duty of the federal court, sitting in diversity, is to determine the content of state law as the highest court of the state would interpret it." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 636 (7th Cir. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 80 (1938)). If the highest state court has not decided the issue, the federal court must predict how that court would rule if the case were before it. *See id.* at 635–37. "Decisions by the state's appellate courts are given great weight in making this prediction." *Am. Ins. Co. v. Crown Packaging Int'l*, 813 F. Supp. 2d 1027, 1037 (N.D.

11

Ind. 2011) (citing *Allstate*, 285 F.3d at 637). "When there is an absence of authority, relevant cases from other jurisdictions may be consulted." *Am. Ins. Co.*, 813 F. Supp. 2d at 1037 (citing *Amerisure, Inc. v. Wurster Constr. Co., Inc.*, 818 N.E.2d 998, 1004 (Ind. Ct. App. 2004)).

The Wisconsin Supreme Court has not analyzed the meaning of the term "amount of loss" in an appraisal provision of an insurance contract. In *Farmers Automobile Insurance Ass'n v. Union Pacific Railway Co.*, the court explained that "[a]n appraisal process is an agreement by parties to a contract to allow third party experts to determine the value of an item." 2009 WI 73, ¶ 42, 768 N.W.2d 596, 606–07. The issue in *Farmers* was whether an appraisal award should have been vacated or modified because the appraisers did not understand their task. *See id.* at 599, 606. The alleged lack of understanding, however, did not involve issues concerning the extent of damage or the scope of repairs. Thus, the general discussion of the appraisal process in *Farmers* does not control the meaning of "amount of loss" in this case.

The Wisconsin courts of appeal have not addressed the issue either. In *Lynch v. American Family Mutual Insurance Co.*, the court considered whether an insurance company could compel appraisal of a loss after its insured sued the company for breach of contract related to that loss. 473 N.W.2d 515, 516 (Wis. Ct. App. 1991). To resolve that question, the court explained the difference between appraisal and arbitration, noting that "an appraisal extends merely to the resolution of the specific issues of actual cash value and the amount of loss, all other issues being reserved for settlement by negotiation, or litigated in an ordinary action upon the policy." *Id.* at 518 (quoting 14 *Couch on Insurance 2d* § 50:5, at 164–65 (rev. ed. 1982)). The court, however, did not analyze the meaning of "amount of loss."

The Wisconsin Court of Appeals also considered the scope of appraisal in *St. Croix Trading Co. v. Regent Insurance Co.* The issue in *St. Croix* was whether an appraisal panel

12

exceeded its authority when it issued an award that showed values of $0 for several disputed items. 2016 WI App 49, ¶¶ 1–6, 882 N.W.2d 487, 489–90. Because no Wisconsin court had addressed the issue, the court discussed cases the parties cited from other jurisdictions. *Id.* at 490–91. For example, the court noted that the Minnesota Supreme Court held that "the phrase 'amount of loss' is not ambiguous, because it is susceptible to only one reasonable interpretation. Specifically, in the insurance context, an appraiser's assessment of the 'amount of loss' necessarily includes a determination of the cause of the loss, and the amount it would cost to repair that loss." *Id.* at 491 (quoting *Quade v. Secura Ins.*, 814 N.W.2d 703, 706 (Minn. 2012)).

The Wisconsin appellate court ultimately determined that the appraisal panel exceeded its authority by considering coverage. *St. Croix*, 882 N.W.2d at 490–92. Because the panel clearly considered coverage—it explicitly noted that its award for one disputed item was "advisory only" because the appraisers did not "confirm coverage"—the court did not need to adopt the Minnesota court's reasoning from *Quade*. *St. Croix*, 882 N.W.2d at 491–92. The court did, however, cite with approval several cases from other jurisdictions holding that a dispute over the extent of the damage is an amount-of-loss issue, not a coverage issue. *See id.* at 492–93 (collecting cases).

As for persuasive authority, both the Windsors and State Farm cite cases that purportedly support their respective interpretation of "amount of loss." For example, in *Higgins v. State Farm Fire & Casualty Co.*, Judge Griesbach held that "a factual dispute over the means and cost of correcting the damage" resulting from a fire was not a coverage dispute but rather a dispute "over the amount of loss." No. 22-C-198, 2022 WL 4016972, 2022 U.S. Dist. LEXIS 158835, at *3–4 (E.D. Wis. Sept. 2, 2022). Conversely, my colleague from the Western

13

District of Wisconsin suggested in *Beer v. Travelers Home & Marine Insurance Co.* that a dispute over whether damage to a roof was caused by a hailstorm (a covered loss) or wear-and-tear (not covered) presented a coverage issue not appropriate for appraisal. No. 19-cv-306-wmc, 2020 WL 5095470, 2020 U.S. Dist. LEXIS 156638, *21–24 (W.D. Wis. Aug. 28, 2020).

Courts from outside Wisconsin have also reached seemingly divergent conclusions on whether a dispute over the extent of damage or method of repair is appraisable, though most courts seem to find those issues inherent in determining the amount of loss. *Compare Hart v. State Farm Fire & Cas. Co.*, 556 F. Supp. 3d 735, 746–47 (E.D. Mich. 2021) (appraisable); *Phila. Indem. Ins. Co. v. WE Pebble Point*, 44 F. Supp. 3d 813, 817–19 (S.D. Ind. 2014) (same); *Johnson v. Nationwide Mut. Ins. Co.*, 828 So. 2d 1021, 1022 (Fla. 2002) (same); *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 891–93 (Tex. 2009) (same); *Haddock v. State Farm Fire & Cas. Co.*, No. 21-cv-12395, 2022 WL 16625964, 2022 U.S. Dist. LEXIS 198716, at *19–30 (E.D. Mich. Nov. 1, 2022) (same); *Khaleel v. Amguard Ins. Co.*, No. 21 C 992, 2022 WL 425733, 2022 U.S. Dist. LEXIS 24851, at *3–7 (N.D. Ill. Feb. 11, 2022) (same); *State Farm Fire & Cas. Co. v. Harper*, No. 3:20-cv-00856, 2021 WL 6133774, 2021 U.S. Dist. LEXIS 245383, at *7–10 (M.D. Tenn. Aug. 13, 2021) (same) *with Brewer v. State Farm Fire & Cas. Co.*, 641 S.W.3d 445, 448–51 (Mo. Ct. App. 2022) (not appraisable); *Fox v. State Farm Fire & Cas. Co.*, No. 2:20-cv-18131 (BRM) (ESK), 2021 WL 4398740, 2021 U.S. Dist. LEXIS 184787, at *21–27 (D.N.J. Sept. 24, 2021) (not appraisable).

The synthesizing principle from these cases—if there is one—was convincingly stated by the Florida Supreme Court as follows: "causation is a coverage question for the court when an insurer wholly denies that there is a covered loss and an amount-of-loss question for the appraisal panel when an insurer admits that there is covered loss, the amount of which is

14

disputed." *Johnson*, 828 So. 2d at 1022. In other words, if coverage is the primary issue, the dispute is not subject to appraisal. But if the "coverage" question is primarily one of *causation*—for example, the extent of loss caused by the covered event versus some non-covered event—that should be fair game for appraisal because the appraisal would be addressing the "amount of loss." Those issues are inherent in determining the amount of loss, "[r]egardless of whether one estimate recommends tearing down the structure and one does not." *Harper*, 2021 U.S. Dist. LEXIS 245383, at *7–8. Moreover, to the extent the above cases demonstrate ambiguity about the meaning of "amount of loss," Wisconsin law requires this court to construe any ambiguity against State Farm, the drafter of the policy.

Suppose a roof is undisputedly damaged by a hailstorm. In State Farm's view, if the insurer claimed that some part of the damage was caused by preexisting "wear and tear," that would transform an otherwise *bona fide* amount-of-loss dispute into a prohibited "coverage" question. But of course that would close the door to countless seemingly proper appraisal cases simply because the insurer disputed that some amount of damage—however trifling—was caused by the covered event. Unless the building is brand new, there will presumably always be a "wear and tear" defense that could defeat an appraisal. "Wear and tear is excluded in most property policies (including this one) because it occurs in every case. If State Farm is correct that appraisers can never allocate damages between covered and excluded perils, then appraisals can never assess hail damage unless a roof is brand new." *State Farm Lloyds v. Johnson,* 290 S.W.3d 886, 892–93 (Tex. 2009). The fact is that it's hardly unusual for an insurer to admit that *some* coverage exists while contesting the extent or scope of the damage, or while pointing the finger at another cause (wear and tear, dry rot, etc.) Sorting out

15

these hybrid causation/coverage disputes would seem to be well within the wheelhouse of experts chosen to serve on an appraisal panel.

In sum, I predict that the Wisconsin Supreme Court, if faced with the issue, would conclude that the parties' dispute over the extent of the loss and the scope of the repairs is an appraisable amount-of-loss issue. *See also* Ashley Smith, *Property Insurance Appraisal: Is Determining Causation Essential to Evaluating the Amount of Loss?*, 2012 J. Disp. Resol. 591, 599 (2012) (noting that "courts have tended to favor allowing the determination of causation in the appraisal process.")

### III. The Windsors Properly Demanded Appraisal

State Farm also contends that the Windsors failed to properly invoke the appraisal provision. Specifically, the insurer maintains that the Windsors did not provide "written, itemized documentation of a specific dispute as to the amount of the loss, identifying separately each item being disputed" at least ten days before demanding appraisal. Malloy Aff. Ex. 2, at 25. State Farm did not mention the alleged itemization deficiency when it rejected the Windsors' appraisal demand. *See* Schmidt Decl. Ex. 10. Potential forfeiture aside, State Farm does not dispute that the Windsors have consistently questioned the feasibility of the insurer's potential solutions and insisted that the only feasible remedy is to raze and rebuild the entire home. To that end, the Windsors provided State Farm an itemized replacement cost estimate months before they demanded appraisal. *See* Schmidt Decl. Ex. 6. The Windsors also included with their demand letter an itemized estimate of what it would cost to implement the insurer's exterior plan. *See* Malloy Aff. Ex. 2, at 44–55.

State Farm offers two reasons why the cost estimates do not satisfy the policy's itemization requirement, but neither one is convincing. First, according to State Farm, it is

unclear which of the two estimates the Windsors intend to rely on. But again, given that the Windsors have consistently claimed that their home is a total loss, it's clear that the replacement cost estimate is their first choice and that the Windsors provided the repair cost estimate merely to highlight their disagreement as to the scope of State Farm's proposed solution. Second, State Farm claims that it is unclear what items remain in dispute. In most cases, the court would agree that merely providing an itemized cost estimate is insufficient. In this case, however, State Farm cannot genuinely claim to lack notice as to the items in dispute. State Farm believes that the cracked basement wall can be repaired for a certain cost. The Windsors, on the other hand, insist that the entire home must be replaced, which obviously involves a much higher price tag. In other words, all the items are specifically disputed. Under those unique circumstances, I find that the Windsors complied with the appraisal provision's itemization requirement.

## CONCLUSION

Because the parties clearly disagreed over the "amount of the loss" on the Windsors' home, and because the Windsors properly demanded appraisal under their homeowners policy, State Farm cannot avoid the appraisal process. Accordingly, the court **GRANTS** the plaintiffs' motion for declaratory judgment, ECF No. 13, and the parties are directed to follow the appraisal procedure set forth in the policy. The case is **STAYED** and administratively closed until the appraisal is complete.

**SO ORDERED** this 27th day of June, 2023.

_____
STEPHEN C. DRIES
United States Magistrate Judge